1
2
3
4
5
6                  IN THE UNITED STATES DISTRICT COURT

7                      FOR THE DISTRICT OF ARIZONA

8

9   United States of America,          )
                                        )
10            Plaintiff,                 )          CR-09-0031-TUC-DCB (JCG)
                                        )
11  vs.                                  )
                                        )          **REPORT &**
12  Anibal Fonseca-Olivas,              )          **RECOMMENDATION**
                                        )
13            Defendant.                 )
                                        )
14                                       )
    _____ )
15

16          Defendant, Anibal Fonseca-Olivas, has filed a Motion to Suppress Physical Evidence

17  and Statements based on the Fourth and Fifth Amendments of the United States Constitution.

18  Pending before the Court are the Defendant's Motion to Suppress ("Motion") (Doc. No. 22)

19  and the United States' Opposition to Defense Motion ("Response") (Doc. No. 24).  This

20  matter was set for evidentiary hearing and evidence was heard on May 26, 2009. (Doc. No.

21  31.) Defendant Anibal Fonseca-Olivas was present and represented by counsel.  This matter

22  was submitted following oral argument at the conclusion of the hearing and was taken under

23  advisement.

24          Having now considered the matter, the Magistrate Judge recommends that the District

25  Court, after its independent review, deny Defendant's Motion to Suppress.

26                          **FACTUAL FINDINGS**

27          On the morning of December 8, 2008, at approximately 5 a.m., U.S. Border Patrol

28  officials closed the temporary immigration checkpoint on Interstate 19 at kilometer post 42,

near Amado, Arizona, due to rain.  As is typical, the agents who were assigned to work at the checkpoint that morning were reassigned to "highway operations," patrolling the area in their vehicles.  Highway operations involves looking for illegal activity on I-19.

U.S. Border Patrol Agent William Thornbloom[1] was one of the agents engaged in highway operations on the morning of December 8, 2008.  According to Agent Thornbloom, the checkpoint is located at kilometer post 42 because all the traffic funnels to that point and there are no frontage roads in that area which might enable smugglers to avoid the checkpoint.  When the checkpoint is closed, illegal activity increases because "scouts" communicate with smugglers to inform them of the closure; the closure makes it easier to avoid law enforcement detection of illegal loads.  As a result, Agent Thornbloom was on high alert for suspicious activity that morning.

Agent Thornbloom was parked in the median on Interstate 19, several kilometers south of the checkpoint, in an unmarked Ford pick-up truck with light bars in the grill and a light that covers the entire headliner of the inside of the windshield. Agent Thornbloom parked the truck by the highway with its headlights on (high beams) so that he could observe northbound traffic.  He parked the truck at a northeast angle to enable him to see into passing vehicles without shining his lights directly into the oncoming driver's eyes.

At approximately 6:40 a.m.,[2] Agent Thornbloom observed a Jeep Grand Cherokee pass with a Chevrolet Tahoe driving less than a car length behind it.  Agent Thornbloom found it suspicious that the two vehicles were driving so closely because in his experience, tandem driving is a method of driving used by narcotics and alien smugglers to throw off law

---

[1]Agent Thornbloom has been with the United States Border Patrol for a little over four years. He has spent 75% of that time assigned to checkpoint duties.

[2]During Agent Thornbloom's testimony, the government presented radio transmissions of the agents' communications on December 8, 2008, which Agent Thornbloom interpreted and explained as part of his testimony.  The transmissions establish the actual time of the events as they occurred.

1    enforcement agents.  Moreover, the highway was wet and he thought it was dangerous for

2    two cars to be driving so closely under those weather conditions at highway speeds.

3         The sun had not yet risen over the mountains to the east outside, but there was some

4    ambient light.  With that light and his headlights, Agent Thornbloom could see the driver of

5    the Jeep as it approached and passed him.  He could see the driver clearly; he was staring

6    straight ahead.  Agent Thornbloom found it suspicious that the driver of the Jeep did not look

7    at him as he passed.  According to Agent Thornbloom, he has an unmarked white pickup

8    truck and usually when he parks in the median, people look over to see what is happening.

9         As a result of these observations, at approximately 6:42 a.m., Agent Thornbloom

10   pulled out of the median, caught up to the vehicles, and requested registration checks.  The

11   registration checks revealed that the Tahoe belonged to Pauline Gallego Hong with a Tucson

12   address, and that the Jeep belonged to Mireya Valdez-Blanco with a Rio Rico address.

13   Agent Thornbloom notified other agents about the two vehicles and Agents Terry and Reilly

14   indicated they would pursue the Tahoe.

15        Agent Thornbloom passed the Tahoe and pulled next to the Jeep to try to look inside.

16   The Tahoe then slowed down.  Agent Thornbloom could not see anything in the rear cargo

17   area of the Jeep.  When he pulled forward he could see the rear seat and saw silhouettes of

18   large square objects covered by blankets.  He believed the objects were bundles of marijuana.

19   In his experience, narcotic smugglers attempt to conceal bundles of marijuana with blankets.

20   As he pulled up further, he could see the driver, who was sitting straight up, very rigid,

21   gripping the steering wheel tightly with both hands.  The driver was staring straight ahead

22   and his seat was moved forward.  Agent Thornbloom thought it was abnormal for the driver

23   of the Jeep, whom he observed to be a large man, to be sitting so close to the steering wheel.

24   It appeared that something may have been preventing him from moving his seat back.  In

25   Agent Thornbloom's experience, smugglers may cram people or bundles of marijuana into

26   a vehicle which causes the driver's seat to be pushed very far forward and straight up.

27        Agent Thornbloom decided to pull over the Jeep.  He was suspicious because of the

28   tandem driving with the Tahoe, the driver's failure to look at his vehicle in the median when

- 3 -

1   it passed, the abnormal position of the driver's seat in the Jeep, and because he thought the

2   square bundles he had observed on the rear seat were marijuana.  Around kilometer post 43,

3   when he was directly behind the Jeep, Agent Thornbloom activated his emergency lights to

4   initiate a stop of the Jeep.  On the front of the service vehicle, the emergency lights consisted

5   of red and blue lights in one place, strobe lights, headlamps in the corners, "wigwags" (which

6   alternate high beams back and forth), a row of blue lights and a row of red lights on the side.

7   All emergency lights come on at the same time.

8        The driver of the Jeep initially responded.  The Jeep pulled onto the shoulder and

9   started to slow down.  It slowed down to what Agent Thornbloom believed was a stop.  But

10  when Agent Thornbloom opened his door to get out, the Jeep continued to roll northbound

11  on the shoulder of the highway.  Agent Thornbloom got back into his truck and followed the

12  Jeep as it drove up the shoulder in the emergency lane an additional three to four kilometers.[3]

13  Agent Thornbloom estimates that the Jeep was driving on the shoulder at 30 or 40 miles per

14  hour.  Agent Thornbloom testified that, based on his experience, he anticipated that the driver

15  might be intending to pull far enough ahead of the patrol car so he could "bail out" and get

16  away.  This added to his suspicion that the vehicle was involved in illegal activity.

17       At approximately 6:47 a.m., Agent Thornbloom radioed that the vehicle was "good

18  for something."   He radioed, "I don't know if it's 46 or not . . . there is stuff covered in the

19  back."  "46" is the radio code used for narcotics.

20       The Jeep finally came to a stop at kilometer post 47 and after some interaction, Agent

21  Thornbloom handcuffed the driver, Defendant Anibal Fonseca.  After opening the driver's

22  side rear door of the Jeep, Agent Thornbloom found large square bundles of marijuana

23  wrapped in white trash bags covered by a blanket.  The blanket was dark blue with stripes.

24

25  ─────────────────

26       [3]At the hearing, defense counsel established that at a previous suppression hearing
    challenging the stop of the Tahoe, Agent Thornbloom had testified that the Jeep continued
27  northbound on the shoulder for two to three kilometers.  The radio transmission established that the
    Jeep traveled for three to four kilometers and that Agent Thornbloom's earlier estimate was slightly
28  low.

1   In all, 19 bundles of marijuana were removed from the vehicle.   At 6:48 a.m., Agent
2   Thornbloom radioed that the Jeep was "positive for narcotics."

3          The Defendant testified and corroborated significant portions of Agent Thornbloom's
4   testimony. According to the Defendant, on the early morning of December 8, 2008, he was
5   traveling northbound on I-19.   The sun was rising.   Defendant saw Agent Thornbloom's
6   truck in the median, but admitted that he did not look at it.   He didn't feel any need to.   He
7   confirmed that he was driving with both hands on the steering wheel.   He did not want to be
8   distracted because the road was wet and he did not want to cause an accident.

9          With respect to Agent Thornbloom's testimony that the Defendant's Jeep was
10  traveling in tandem with the Chevy Tahoe, the Defendant acknowledged that there was a
11  truck following behind him at the time he passed Agent Thornbloom's truck parked in the
12  median - although he estimated the other vehicle was 6-7 meters behind him.   The Defendant
13  also confirmed that Agent Thornbloom pulled his white truck beside the Jeep and drove
14  alongside him for about two minutes - not side by side, but slightly behind him.   After
15  tracking him for one to two minutes, the white truck turned on its flashing lights.

16         The Defendant testified that the emergency lights (flashing red and blue and strobe
17  lights) of the truck were activated while the truck was in the passing lane; according to the
18  Defendant, there was a little red car behind his Jeep.   Defendant testified that the red car
19  braked, at which point the white truck pulled in behind the Defendant and the Defendant
20  pulled over to the side of the road.

21         The Defendant confirmed that he did not stop immediately in response to the flashing
22  lights; he stated that he could not do so because he had been traveling 70mph and he could
23  not just slam on his brakes.   He stated that he took "five – oh, well, less than three minutes"
24  to slow down.   The Defendant claimed that he did not take off again, because he had never

25
26
27
28

actually stopped.  He also testified that it was untrue that he continued for about two to three kilometers.  Defendant stated it was not even half a kilometer.[4]

The Defendant acknowledged that there were bundles of marijuana in the vehicle and that the marijuana in the passenger area of the back seat was covered with a thick wool blanket.  Defendant claimed that you could not tell that there were bundles underneath the blanket because of the way he had stacked the bales.  The Defendant confirmed that the bundles of marijuana were in white trash bags, each about a foot and a half to two feet long.

## **ANALYSIS**

Defendant contends that his vehicle was stopped without reasonable suspicion, in violation of his Fourth Amendment rights, and that Defendant's statements made following his arrest were the result of an illegal stop.  Accordingly, Defendant asserts that both the marijuana and the statements must be suppressed.

**I.    Suppression of the Marijuana**

The Fourth Amendment prohibits "unreasonable searches and seizures" by the Government.  When this constitutional right is violated, the exclusionary rule bars the use

---

[4]Both Agent Thornbloom and Defendant testified as to a physical confrontation that occurred after the Jeep completely yielded.  Agent Thornbloom testified that the Defendant refused to remain in the vehicle and continued to advance towards the agent despite being given verbal commands in English and Spanish to get back in the vehicle.  Defendant testified that Agent Thornbloom assaulted him for no reason before he could even get out of the Jeep.  The testimony regarding the confrontation is irrelevant to the determination of whether there was reasonable suspicion to stop the Jeep because it occurred after the Jeep was stopped.  The testimony, however, did further convince the Magistrate Judge that the Defendant was not a truthful witness.  His testimony that the agent kicked him in the chest while he was still sitting in the Jeep was implausible.  Defendant is a large man and it is inconceivable how the agent could have placed his foot between the steering wheel and Defendant's chest.  Moreover, Defendant was inconsistent in his testimony and appeared to slip up in recounting the events.  Although Defendant initially testified that he was never able to get out of the car, he later answered the question, "How did you eventually get out of the vehicle after he stopped you?" with the response: "When I stopped the car he was behind me.  I mean, I was already stopped, what could I do?  I could not run.  I could not run away.  So I got out with my hands up."  Defendant then seemed to realize that he had slipped up, and stated: "Well, I tried to get out of the car with my hands up and I had a little bottle – bottle of water . . . in my hands and I told him that I wanted to drink the water."  (Tr. 172)  Defendant's testimony that he got out of the car with his hands up with the water supported Agent Thornbloom's testimony which, in contrast to Defendant's, was consistent and credible.

1   of seized evidence at trial. *See Weeks v. United States*, 232 U.S. 383, 393-94 (1914); *Mapp*

2   *v. Ohio*, 367 U.S. 643, 654 (1961).   The Fourth Amendment's prohibition against

3   unreasonable searches and seizures extends to brief, investigatory stops of persons or

4   vehicles that fall short of traditional arrests. *See Terry v. Ohio*, 392 U.S. 1, 9 (1968). A stop

5   is justified under the Fourth Amendment if the officer's action is supported by reasonable

6   suspicion to believe that the person stopped is, or is about to be, engaged in criminal activity.

7   *See United States v. Arvizu,* 534 U.S. 266, 273 (2002).   In making a reasonable suspicion

8   determination, the Court looks to the totality of the circumstances to evaluate whether the

9   detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing.

10  *Id.*   Reasonable suspicion can be based on the officer's own experience and specialized

11  training.   *Id.*     In fact, officers may make inferences from and deductions about the

12  cumulative information available to them that "might well elude an untrained person." *Id.*

13       Any number of factors may be taken into account in deciding whether there is

14  reasonable suspicion to stop a car in the border area. *See United States v. Brignoni-Ponce*,

15  422 U.S. 873, 884-85 (1975). Officers may consider the characteristics of the area in which

16  they encounter a vehicle: its proximity to the border, the usual patterns of traffic on the

17  particular road, and the officer's previous experience with alien traffic. *Id.* (citations

18  omitted). In addition, the driver's behavior may be relevant, as erratic driving or obvious

19  attempts to evade officers can support a finding of reasonable suspicion. *Id.* at 885 (citations

20  omitted). Aspects of the vehicle itself may also justify suspicion. *Id.* For instance, officers

21  say that certain station wagons, with large compartments for fold-down seats or spare tires,

22  are frequently used for transporting concealed aliens.   *Id.* (citing *United States v.*

23  *Bugarin-Casas*, 484 F.2d 853 (9th Cir. 1973); *United States v. Wright*, 476 F.2d 1027 (5th

24  Cir. 1973)). The vehicle may appear to be heavily loaded, it may have an extraordinary

25  number of passengers, or the officers may observe persons trying to hide. *Id.*   In all

26  situations, officers are entitled to assess the facts in light of their own experience. *Id.* (citing

27  *Terry*, 392 U.S. at 27).

28

1    Based on the credible testimony of Agent Thornbloom, the Magistrate Judge

2   concludes that the stop of Defendant's vehicle was supported by reasonable suspicion.  First,

3   Agent Thornbloom knew the permanent checkpoint was closed and, based on his experience,

4   expected that illegal activity would increase.  *See United States v. Tiong*, 224 F.3d 1136,

5   1139 (9th Cir. 2000) (holding that characteristics of suspected smugglers road on which

6   investigatory stop of vehicle occurred justified reliance on area as factor giving rise to

7   reasonable suspicion for stop, including proximity to the border, usual patterns of traffic and

8   time of day, previous alien or drug smuggling in the area and officer experience).  Defendant

9   also appeared to be driving in tandem with another vehicle, the Tahoe.  *See United States v.*

10   *Larios-Montes*, 500 F.2d 941, 943-44 (9th Cir. 1974) (driving in tandem is a factor to be

11   considered in the reasonable suspicion analysis); *but see United States v. Munoz*, 604 F.2d

12   1160,1161 (9th Cir. 1979) (driving in tandem and failing to look at nearby Border Patrol

13   agents alone is not enough for reasonable suspicion).  In addition, Defendant's behavior was

14   suspicious: Defendant did not look at Agent Thornbloom's unmarked vehicle in the median

15   when Defendant drove past it; Defendant was gripping the steering wheel tightly and staring

16   straight ahead when Agent Thornbloom was driving next to him; and the Defendant's seat

17   appeared to be pushed up as if the cargo in the seat behind him necessitated the awkward

18   position.  When Agent Thornbloom looked into Defendant's vehicle, he observed square

19   bundles covered with a blanket.  In Agent Thornbloom's experience, smugglers often conceal

20   their loads with blankets and the shape of the bundles suggested to him that what was

21   concealed was marijuana.  Finally, when Agent Thornbloom attempted to stop Defendant,

22   he did not immediately yield; he began to stop, then continued along the shoulder of the road

23   for 3-4 kilometers, leading Agent Thornbloom to believe that the driver or occupants might

24   be preparing to bail out.

25    Agent Thornbloom's testimony was corroborated by the radio transmissions which

26   occurred simultaneous with the stop.  In the radio transmissions, Agent Thornbloom

27   indicated that he saw two cars that appeared to be driving in tandem and bundles which he

28   believed to be contraband.  Agent Thornbloom's testimony was also corroborated by the

1    Defendant; the Defendant admitted that: he did not look at Agent Thornbloom's car in the

2    median; he had both hands on the steering wheel and looked straight ahead when Agent

3    Thornbloom was driving next to him; there was a truck following close behind him when he

4    passed Agent Thornbloom's truck in the median; he failed to immediately pull over when

5    Agent Thornbloom activated his emergency lights; and Defendant had placed bundles of

6    marijuana in the rear passenger area of the Jeep and covered those bundles with a blanket.

7    Although Defendant testified that he had stacked the marijuana in such a manner that its

8    silhouette could not be viewed by others, apparently, he was wrong in that belief.[5]

9         Whether Agent Thornbloom had reasonable suspicion to stop the Jeep is not a close

10   call.  The factors articulated by all Agent Thornbloom, when taken together, undoubtedly

11   form a particularized and objective basis for stopping the Defendant's vehicle.  Accordingly,

12   the marijuana seized from the vehicle should not be suppressed under the exclusionary rule.

13

14   ─────────────

15        [5]Defendant's arguments that Agent Thornbloom was not credible were not well founded.
     Defendant asserted that Agent Thornbloom, at a previous suppression hearing, testified that
16   Defendant's failure to stop in response to the activation of emergency lights was an attempt to bail
     out whereas at the hearing in the pending case, Thornbloom characterized it as attempting to flee.
17   Agent Thornbloom explained that when a vehicle comes to a stop and the passengers bail out, that
     is also attempting to flee.  They can be the same thing.  He worded it differently at the previous
18   hearing.  This was not a major contradiction as suggested by Defendant.
          The fact that Agent Thornbloom testified at a previous hearing that Defendant was nervous,
19   but did not testify at this hearing that Defendant was nervous does not support a conclusion that
     Agent Thornbloom was not truthful.  Agent Thornbloom was not specifically asked a question as
20   to Defendant's nervous appearance by either party.  This was not a change in Agent Thornbloom's
21   testimony.
          The video filmed by defense counsel's paralegal does not demonstrate that Agent
22   Thornbloom was untruthful when he testified that he could observe what direction Defendant was
     looking as he drove by in the Jeep on December 8.  The video was not made in a manner which re-
23   created conditions on that morning.  In fact, Agent Thornbloom was proved accurate in his
     observation as Defendant confirmed that he did not look over at Agent Thornbloom when he passed
24   by.
          Finally, Defendant's argument that there was no reason for Defendant to look over at Agent
25   Thornbloom's unmarked vehicle because people who live in that area regularly see Border Patrol
26   Agents in the median is unpersuasive.  The determinative question is not whether it the driver's
     actions are reasonable, it is whether they are suspicious.  In Agent Thornbloom's experience as a
27   law enforcement officer who regularly parks in the median, most drivers do look over at a vehicle
28   parked in the median.

1    **II.     Suppression of the Defendant's Statements**

2         Under the fruit-of-the-poisonous-tree doctrine, the exclusionary rule extends not only

3    to direct violations by the Government, but also to secondary evidence obtained because of

4    the violation.  *See Silverthorn Lumber Co. v. United States*, 251 U.S. 385, 392 (1920); *see*

5    *also Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963).  Here, Defendant argues that

6    since there was no reasonable suspicion for the initial stop, there was a direct Fourth

7    Amendment violation and Defendant's subsequent statements must be suppressed as fruit of

8    the poisonous tree.  However, as discussed above, Agent Thornbloom had a particularized

9    and objective basis for stopping the Defendant's vehicle.  As such, there was no Government

10   violation requiring suppression of the statements.

11        Accordingly, the Defendant's statements made following his arrest should not be

12   suppressed under the exclusionary rule.

13                              **<u>RECOMMENDATION</u>**

14        In view of the foregoing, it is recommended that, after its independent review of the

15   record, the District Court DENY Defendant's Motion to Suppress filed on April 20, 2009.

16   (Doc. No. 22.)  The parties have ten (10) days to serve and file written objections to the

17   Report and Recommendation.  The parties are advised that any objections should be filed

18   with the following caption: **CR-09-0031-TUC-DCB.**

19        DATED this 5th day of June, 2009.

20

21

22

23

24                              _____
                                        Jennifer C. Guerin
25                                 United States Magistrate Judge

26

27

28